Filed 8/26/20  Walsh Shea Corridor Construction v. Cal. Occupational etc. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| WALSH SHEA CORRIDOR CONSTRUCTORS, | B300019 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS172720) |
| v. | |
| CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH APPEALS BOARD, | |
| Defendant and Respondent; | |
| CALIFORNIA DIVISION OF OCCUPATIONAL SAFETY AND HEALTH, | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mitchell L. Beckloff, Judge.  Affirmed.

Monteleone & McCrory, Diana M. Dron and Patrick J. Duffy for Plaintiff and Appellant.

J. Jeffrey Mojcher, Chief Counsel, Aaron R. Jackson, Autumn R. Gonzalez, and Andia Farzaneh, Industrial Relations Counsel for Defendant and Respondent.

Division of Occupational Safety & Health, Christopher Grossgart, Rocio Y. Garcia-Reyes, and Eric L. Compere for Real Party in Interest and Respondent.

_____

Petitioner and appellant Walsh Shea Corridor Constructors (WSCC) appeals from the judgment entered in favor of respondents California Occupational Safety and Health Appeals Board (the Board) and real party in interest California Division of Occupational Safety and Health (the Division) after the trial court denied WSCC's petition for writ of administrative mandamus.  WSCC's petition sought to vacate the Board's decision affirming a citation issued by the Division against WSCC for violating title 8, section 1630, subdivision (a) (hereafter § 1630(a)), of the California Code of Regulations.[1]  We affirm the judgment.

## BACKGROUND

WSCC contracted with the Los Angeles County Metropolitan Transit Authority to construct the Crenshaw/LAX Transit Corridor Project.  The project included construction of a subway station at the corner of Rodeo Road and Crenshaw Boulevard (the Exposition site).  Construction at the Exposition site was a "cut-and-cover operation," defined in the regulations as "subway stations which are both physically connected to ongoing underground construction operations and are covered in such a manner as to create conditions characteristic of underground

_____

[1]     All further references are to title 8 of the California Code of Regulations, unless otherwise specified.

construction." (§ 8403, subd. (a)(1).) In this case, the operation involved digging an excavation, constructing a subway station at the invert level, and then backfilling the excavation and replacing the street.

Beginning in January 2015, the Division and WSCC discussed the need for a construction passenger elevator as required by section 1630, subdivision (a) (hereafter § 1630(a)), and whether an exception might apply. WSCC maintained that section 1630 did not apply and that the industry standard was to use stair towers as the primary means of ingress and egress to the excavation site. WSCC argued that similar subway stations had been built without use of a construction passenger elevator. As an alternative to a construction passenger elevator, WSCC proposed using an onsite crane with an attachable cage to be used as needed. The Division rejected WSCC's proposed alternative because it did not provide continuous access. Despite the absence of an approved alternative means of continuous access, WSCC proceeded with the construction without installing a construction passenger elevator.[2]

The Division conducted an inspection of the Exposition site in September 2015. At that time, the excavation at the construction site was 800 feet long and 60 feet wide for the southernmost two-thirds of its length, increasing to 100 feet wide for the northernmost third of its length. As of September 21, 2015, the excavation was 65 feet deep. No construction passenger elevator had been installed, and approximately 70 employees entered and exited the worksite by means of a stair tower.

_____

[2]     WSCC, under protest, installed a construction passenger elevator at the construction site in November 2015.

3

The excavation had pieces of concrete decking covering portions of its top at street level, leaving openings that were used to carry materials and tools in and out of the excavation. The Division's inspection described the excavation as a box without a top, with the pieces of decking arranged to create openings and to allow cars, trucks, and buses to continue to drive on Crenshaw Boulevard. The decking was not permanent and could be removed and reconfigured as needed. Inside the excavation a weldment of struts and steel walers had been constructed as a shoring system, and slurry walls filled the excavation from street level to the invert level. Following the inspection, the Division issued a citation alleging a willful general violation of section 1630.

WSCC appealed the citation, and the matter proceeded to a hearing before Administrative Law Judge Howard Chernin. Witnesses for both WSCC and the Division testified concerning the Exposition site and the applicability of section 1630. WSCC argued that section 1630 did not apply and that another regulation, section 8403, governed instead.

On September 5, 2017, ALJ Chernin issued a decision upholding the citation in full. WSCC filed a petition for reconsideration. On February 9, 2018, the Board issued a decision upholding the general violation of section 1630 but removing the willful classification.

WSCC then filed a petition for writ of mandate in the superior court. On March 25, 2019, the trial court denied the petition, finding that the Board's interpretation of section 1630 was not clearly erroneous and was supported by substantial evidence. This appeal followed.

4

**DISCUSSION**

**I. Standard of review and general legal principles**

"'On appeal from the judgment on a petition for writ of administrative mandate in a case not involving fundamental vested rights, as here, we review the agency's findings, not the superior court's decision, for substantial evidence.' [Citations.] 'However, insofar as an appeal from an administrative mandamus proceeding presents questions of law, our review is de novo.' [Citations.]" (*State Dept. of Social Services v. Marin* (2019) 34 Cal. App.5th 328, 334.)

The interpretation of a regulation is a question of law subject to de novo review. (*Department of Industrial Relations v. Occupational Safety & Health Appeals Bd.* (2018) 26 Cal.App.5th 93, 100 (*AC Transit*).) A reviewing court accords an administrative agency's interpretation of its own regulation great weight and deference, however, unless the interpretation is unauthorized or clearly erroneous. (*Lusardi Construction Co. v. California Occupational Safety & Health Appeals Bd.* (1991) 1 Cal.App.4th 639, 645 (*Lusardi*).)

When interpreting an administrative regulation, the ordinary rules of statutory construction apply. (*AC Transit, supra*, 26 Cal.App.5th at p. 100.) The fundamental goal is to ascertain and effectuate the agency's intent in promulgating the regulation. (*Ibid.*) To do so, we look first to the language of the regulation itself, giving the words their plain and ordinary meaning. (*Id.* at p. 101.) If the language is clear and unambiguous, the inquiry goes no further. "'"[W]here a word of common usage has more than one meaning, the one which will best attain the purposes of the [regulation] should be adopted, even though the ordinary meaning of the word is thereby

5

enlarged or restricted and especially in order to avoid absurdity or to prevent injustice.'"' [Citations.] Moreover, '[w]e do not construe a regulation in isolation, but instead read it with reference to the scheme of law of which it is a part, so that the whole may be harmonized and retain effectiveness.' [Citations.]" (*Ibid.*)

## II. Regulatory framework

Title 8, division 1, chapter 4 of the California Code of Regulations sets forth safety orders that apply to various operations. As relevant here, subchapter 4 sets forth construction safety orders (CSOs) and subchapter 20 tunnel safety orders (TSOs).

### *A. Construction safety orders*

Section 1630 is one of the CSOs set forth in subchapter 4. The CSOs "establish minimum safety standards whenever employment exists in connection with the construction, alteration, painting, repairing, construction maintenance, renovation, removal, or wrecking of any fixed structure or its parts." (§ 1502, subd. (a).) The term "structure" is defined as "[t]hat which is built or constructed, an edifice or building of any kind, or any piece of work artificially built up or composed of parts joined together in some definite manner." (§ 1504.)

The CSOs "apply to all excavations not covered by other safety orders for a specific industry or operation." (§ 1502, subd. (a).) At construction projects, the CSOs "take precedence over any other general orders that are inconsistent with them, except for [TSOs] or the Pressurized Worksite Standards in Article 154 of the General Industry Safety Orders." (§ 1502, subd. (b).)

Section 1630(a), the regulation at issue here, provides in relevant part: "In addition to the stairways required in Section

6

1629, a construction passenger elevator for hoisting workers shall be installed and in operation on or in any building, or structure, 60 feet or more in height above or 48 feet in depth below ground level. . . . [¶] The building or structure depth shall be determined by measuring from ground level to the lowest floor level excluding local depression such as sumps and elevator pits."

### B. *Tunnel safety orders*

The TSOs "establish minimum safety standards in places of employment at tunnels, shafts, raises, inclines, underground chambers, and premises appurtenant thereto during excavation, construction, alteration, repairing, renovating or demolishing and the following:  [¶] (1) Cut-and-cover operations such as subway stations which are both physically connected to ongoing underground construction operations and are covered in such a manner as to create conditions characteristic of underground construction."  (§ 8403, subd. (a).)

Section 8495 of the TSOs specifies acceptable means of access in a shaft.  It states in relevant part:  "When a shaft is used as a means of egress, the employer shall make advance arrangements for power-assisted hoisting capability to be readily available in an emergency, unless the regular hoisting means can continue to function in the event of an electrical power failure at the jobsite. . . . [¶] . . . There shall be two safe means of access in shafts at all times.  This may include a ladder and acceptable hoisting system."

A shaft is defined in section 8405 of the TSOs as "[a]ny excavation where its depth is at least twice its greatest cross section dimension.  The sides are nearly parallel or cylindrical.  A shaft is considered to be vertical if its alignment is within 20 degrees of vertical."

7

## III. Applicability of section 1630

WSCC advances several arguments as to why section 1630 did not apply to the Exposition site at the time the Division issued the citation: (1) the CSOs did not apply because no "fixed structure" was present or under construction at the time; (2) the TSOs, and not the CSOs (including section 1630), exclusively governed the excavation at the Exposition site; (3) the concrete decking covering the excavation at the time was a "bridge" that exempted the site from section 1630; and (4) the Exposition site was a "shaft" in which the TSOs allow use of a hoisting device, such as a cage attached to a crane, for emergency egress.

### A. Fixed structure

The Board made a factual finding[3] that WSCC was engaged in the construction of a "structure" at the Exposition site at the time the citation was issued. Substantial evidence supports that finding. There was evidence that the excavation was cross-braced with struts (heavy, 36-inch diameter pipes approximately one-half to three-quarters of an inch thick), and walers (steel beams connected by "very robust weldments" to steel soldier beams). The conjoined struts and walers come within the definition of a "structure" in section 1504 -- "[t]hat which is built or constructed, an edifice or building of any kind, or any piece of work artificially built up or composed of parts joined together in some definite manner."

WSCC contends the struts and walers were not part of a "fixed" structure within the meaning of section 1502 because they were not permanent but rather a temporary shoring system that would eventually be removed from the site. WSCC cites no

_____

[3] Despite WSCC's position at oral argument that this is a legal issue, we accept it as factual.

evidence in the record, however, to support its claim that the structure was temporary.  Even if the structure was temporary, section 1502 would still apply because it covers "fixed" not "permanent" structures.  Section 1502 applies, moreover, not only to construction and maintenance of a fixed structure, but also to its removal or wrecking. (§ 1502, subd. (a).)  Eventual removal of the struts and walers would therefore not preclude application of the CSOs at the time of the Division's inspection.

Substantial evidence supports the Board's finding that the struts and walers, joined together by "robust weldments," constituted a "fixed structure" within the meaning of sections 1502 and 1504.  The CSOs, including section 1630, therefore applied to the work undertaken at the Exposition site.  (§ 1502.)

**B.  *The TSOs do not preclude application of section 1630***

WSCC contends section 1502, subdivision (a), read together with section 8403, support its position that the TSOs exclusively governed the Exposition site.  The plain language of those regulations undermines rather than supports WSCC's argument.

Section 1502, subdivision (a) states that the CSOs "apply to all excavations not covered by other safety orders for a specific industry or operation."  WSCC argues that a cut and cover operation is an excavation covered by another specific industry safety order, namely section 8403, and that the CSOs accordingly do not apply.

WSCC's interpretation is inconsistent with the plain language of section 1502, subdivision (b), which expressly recognizes circumstances where both the CSOs and TSOs may apply.  Section 1502, subdivision (b) addresses potential conflicts between the two sets of regulations:

9

"At construction projects, these Orders [CSOs] take precedence over any other general orders that are inconsistent with them, except for Tunnel Safety Orders or the Pressurized Worksite Standards in Article 154 of the General Safety Orders."

Section 1502, subdivision (b) resolves potential conflicts between CSOs and TSOs. As the trial court noted in its written ruling, WSCC's interpretation of section 1502, subdivision (a) would render section 1502, subdivision (b) superfluous because there would never be a situation in which a CSO and a TSO were in conflict.

TSO sections 8495, subdivisions (a)(1) and (a)(3) are not in conflict with CSO section 1630(a). Rather, as both the Board's decision and the trial court's ruling note, the two sets of regulatory provisions can be harmonized. Section 8495, subdivision (a)(3) requires two means of continuous access, which may include a ladder and a hoisting system. Section 8495, subdivision (a)(1) requires the employer to have a power-assisted hoisting system available for use in an emergency, unless the regular hoisting system can function during an electrical power failure. Section 1630(a) requires a construction passenger elevator when an excavation extends more than 48 feet below the surface. The construction passenger elevator required by section 1630(a) is one of the two means of access under section 8495, subdivision (a)(3). If the elevator cannot function during a power outage, then section 8495, subdivision (a)(1) requires the employer to have a readily available alternate hoisting system that can function during such a power outage. This interpretation is bolstered by section 8495, subdivision (a)(18), which includes construction elevators as an acceptable hoisting

system.[4]  Both section 1630(a) and section 8495, subdivision (a) could apply to the Exposition site.

### C. *Whether the Exposition site was exempt from section 1630*

We reject WSCC's argument that the Exposition site was exempt from the construction passenger elevator requirement because an exception set forth in section 1630(a) applied.  Section 1630(a) allows an alternate means of access at jobsites where unusual site conditions make installation of a construction passenger elevator infeasible:

> "Exceptions:  . . . At work locations where unusual site conditions or unusual structural configurations exist, alternate means of access in conformance with Section 1630(c) shall be permitted."

> "Note:  For the purposes of this Section, unusual site configurations are considered to exist at those work locations where the installation of a construction passenger elevator is not feasible."

> "Unusual site conditions or configurations are bridges, steel tank erection, dams, water towers, antennas, cooling towers, refinery towers, stacks, prefabricated parking structures, tower cranes, etc."

_____

[4]      Section 8495 governs hoisting equipment and systems.  Section 8495, subdivision (a)(3) states:  "There shall be two safe means of access in shafts at all times.  This may include a ladder and acceptable hoisting system."  Section 8495, subdivision (a)(18) states:  "Construction elevator-type hoists as defined in the Construction Safety Orders shall comply with the California Code of Regulations, Title 8, Article 14 of the Construction Safety Orders."

11

WSCC contends the concrete decking covering the excavation at the Exposition site was a bridge, citing the testimony of a witness at the administrative hearing who described the decking as a "major bridge."

At unusual site conditions, such as a bridge, section 1630, subdivision (c) allows an employer to use an alternate means of access acceptable to the Division:

> "At unusual site conditions or structure configurations, the Division shall permit alternate means of access, consisting of one or more, but not limited to, the following:
>
> "(1) Use of personnel platforms designed, constructed, and operated as specified by Section 5004 of the General Industry Safety Orders, and only under the conditions permitted by the general requirements of that section.
>
> "(2) Use of suspended power-driven scaffolds where employees are protected by safety belts secured to independent safety lines by means of a descent control device acceptable to the Division.
>
> "(3) Use of appropriate vehicle-mounted elevating and rotating platforms.
>
> "(4) Use of other means, such as inclined elevators, etc. acceptable to the Division, presented in written form and acceptance granted prior to use."

An employer bears the burden of establishing that this exception applies. (*Chicago Bridge & Iron Co.,* Cal/OSHA App.

76-1082, Decision after Reconsideration (Feb. 4, 1980).[5]  To do so, the employer must demonstrate (1) the existence of an unusual site condition or structural configuration, and (2) an alternate means of access in conformance with section 1630, subdivision (c). (*Ibid.*)

The Board in this case found an unusual site condition existed at the Exposition site, making installation of a construction passenger elevator infeasible for the duration of the project.  The Board further found, however, that WSCC failed to establish the second element of the exception because WSCC did not comply, offer, or provide an alternate means of access in conformance with section 1630, subdivision (c).  Substantial evidence supports the Board's latter finding.

The record shows that after a February 24, 2015 meeting at which the Division informed WSCC that a construction passenger elevator was required, WSCC sought to invoke the exception set forth in section 1630(a).  As an alternative means of access, WSCC offered to make available a crane equipped for transport of personnel consistent with section 5004 of the General Industry Safety Orders (i.e., with an attachable cage capable of carrying a person).  WSCC would not agree, however, to make this alternative means of access continuously available, but agreed to do so only during shift changes and in the event of an emergency. The Division refused to accept WSCC's proposal to make the crane with cage attachment only intermittently available, and WSCC never received the Division's approval for any alternate means of access.

_____

[5]     Decisions of the Board are binding on the Division.  (Lab. Code, § 148.6; *Nolte Sheet Metal, Inc. v. Occupational Safety & Health Appeals Bd.* (2020) 44 Cal.App.5th 437, 446, fn. 15.)

13

The Board found that WSCC's offer of intermittent access did not meet the conditions for the exception, interpreting section 1630(a) and (c) in a manner most protective of workers:

> "[W]e find that the alternate means of access had to be available on a permanent or continual basis, not just during the circumstances identified by Employer. Requiring the availability of the alternate means of access 'at all times' better assures the health and safety of workers. In making this finding, we also note that the alternative means of access is meant to serve as a substitute for a construction passenger elevator, which is provided for access and egress on a permanent and continuous basis. Since the personnel platform will act as a substitute for the elevator, it stands to reason that it should have the same availability."

The Board's interpretation of section 1630 is entitled to great weight and deference as it is neither unauthorized nor clearly erroneous. (*Lusardi, supra*, 1 Cal.App.4th at p. 645.) We agree that the exception did not apply.

### D. Whether a shaft existed at the worksite

The plain language of the applicable regulations does not support WSCC's claim that a shaft existed at the Exposition site. Section 8405 of the TSOs defines a shaft as "[a]ny excavation where its depth is at least twice its greatest cross section dimension. The sides are nearly parallel or cylindrical. A shaft is considered to be vertical if its alignment is within 20 degrees of vertical. For purposes of these safety orders, shaft shall include incline and raise (also see Incline and Raise)."

At the time of the Division's inspection, the excavation at the Exposition site was 65 feet deep and approximately 800 feet long and 60 feet wide for the southern two-thirds, and 100 feet

14

wide for the northern one-third.  Its depth, 65 feet, was not "at least twice its greatest cross section dimension" and therefore did not come within the definition of a shaft.

WSCC argues, as it did at the administrative hearing below, that if the "muck" opening in the concrete decking located above the excavation was used to measure the dimensions of the site, the excavation would come within the definition of a shaft. The Board found, however, that the definition of a shaft refers to the dimensions of the excavation, not the dimensions of the opening above the excavation.  The plain language of the regulation supports that interpretation.

### DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
   CHAVEZ

We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST

15